IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

LUFKIN DIVISION

| | | |
|---|---|---|
| MARK HUGHES #494140 | § | |
| v. | § | CIVIL ACTION NO. 9:09cv90 |
| STEPHEN BRYANT, ET AL. | § | |

MEMORANDUM OPINION AND ORDER OF DISMISSAL

The Plaintiff Mark Hughes, an inmate of the Texas Department of Criminal Justice, Correctional Institutions Division proceeding *pro se*, filed this civil rights lawsuit under 42 U.S.C. §1983 complaining of alleged violations of his constitutional rights. The parties have consented to allow the undersigned United States Magistrate Judge to enter final judgment in this proceeding pursuant to 28 U.S.C. 636(c). As Defendants, Hughes named Captain Stephen Bryant, Major Joe Smith, Warden Billy Hirsh, Warden Timothy Lester, and Warden Timothy Simmons, all Texas prison officials at the Polunsky Unit in Livingston, Texas.

In his complaint, Hughes stated that on November 17, 2008, he and the other building workers went to the front door of 12 Building and went inside to undergo the standard strip search procedure. However, Captain Bryant ordered them out of the building, and told them that they were to strip one at a time. Hughes began to go behind the stripping stall, and Bryant yelled "where are you going?" Hughes replied that he was going behind the stripping stall, and Bryant said no, from now on the inmates would be required to strip outside.

Hughes replied that he was an ordained minister and did not want to be exposed before female employees, and that it was cold that day. He says that Bryant ignored him and told the inmates to strip right on front of the front door. When Hughes stripped outside, it was very cold, and he had to stay outside for about five minutes. This happened on a number of occasions, Hughes said,

when his entry into the building was delayed for one reason or another, and so he has been sick several times.

In addition, Hughes said that the new strip search policy did not protect the inmates from being viewed by female officers. On one or more occasions, Hughes said, the inmate workers had to strip when there was a mailroom lady standing right behind them, and that same day, the female officer in charge of inmates going out on the chain was posted by the front door picket window, where she could observe him stripping. He estimates that he has been observed stripping by female officers on at least 100 occasions.

Hughes acknowledged that "after a while," the officers began allowing the inmates to strip inside, but says that this "is even more unconstitutional," because "you never know who is coming through the front door or around the corner or the front door." He states that "I don't want to be bending over spreading my cheeks when a female officer comes through the door." He says that there were times that he had to turn around, naked, while female officers escorted another inmate through the door; the space is a narrow one, and so they "almost touched him" while passing by. On other occasions, Hughes says, a female mailroom officer came around the corner, trying to get out the front door, and observed the whole strip search. Also, on one occasion, a lady came in out of the cold and stood in the corner until Hughes had finished the strip search, including spreading his cheeks, before she passed by.

Hughes says that for the past 11 years that he has worked in the 12 Building kitchen, the inmates have been allowed to strip in a stripping stall. However, he says, an officer brought a cell phone to a Death Row inmate, who then called a state senator and threatened him. After this happened, Bryant changed the policy, requiring the inmates to strip outdoors. Hughes says that the matter was brought to the attention of the wardens, but they did nothing.

An evidentiary hearing was conducted on October 1, 2009. At this hearing, Hughes stated that when the procedures were changed, the prison officials did not put in a way to block females from observing the searches, and that the inmates were searched in the cold.

Hughes explained that he worked on 12 Building, and that the inmates there used to be strip searched behind a screen. After the cell phone incident, the prison officials began conducting strip searches in the open, so that "everyone can see." Warden Lester, a prison official also present at the hearing, testified that officers were supposed to use "common sense" when it came to searching prisoners outside.

Legal Standards and Analysis

Hughes' complaint and testimony makes clear that his primary complaint is the fact that the strip searches were observed by female officers. He noted that there used to be a screen but that it is no longer used, and referred to occasions in which he had to undergo the entire strip search procedure in front of female officers. Hughes never says that the searches were actually conducted by female officers, but only that they were conducted in areas where they could be and were viewed by female officers. Hughes stated that he is an ordained minister and having to strip in front of females is contrary to his religious beliefs.

In Barnett v. Collins, 940 F.2d 1530 (5th Cir., July 31, 1991) (Table, no. 91-1038) (unpublished), the Fifth Circuit stated that no constitutional violation occurs when naked male inmates are viewed by female guards if the presence of the female guards is required to protect a legitimate governmental interest, such as maintaining security at a correctional facility. That case involved the use of female guards in guard towers, which gave them a full view of male inmates taking showers. *See also* Letcher v. Turner, 968 F.2d 508, 510 (5th Cir. 1992) (citing Barnett in upholding strip searches conducted in the presence of female officers, under exigent circumstances).

Similarly, in Oliver v. Scott, 276 F.3d 736, the plaintiff complained of the practice at the Dawson State Jail of allowing female guards to monitor male inmates in bathrooms and showers, while not using male guards to monitor female inmates under similar circumstances. The district court found that security concerns justified the cross-sex surveillance of male inmates, and the Fifth Circuit agreed with this conclusion.

3

In West v. Parker, 68 F.3d 466 (5th Cir., August 23, 1995) (Table, no. 95-30489)(unpublished), the plaintiff complained that a female officer named Parker was given "unrestricted access" to his dormitory, which was an open room with the showers, urinals, and commodes in plain view, which forced him to be viewed by a stranger of the opposite sex. The Fifth Circuit stated that the plaintiff made no showing that Parker's presence was unnecessary to maintain security, and so the dismissal of the complaint as frivolous was affirmed. *See also* Petty v. Johnson, 193 F.3d 518 (5th Cir., August 25, 1999) (Table, no. 98-40941) (unpublished) (rejecting to challenge to a policy of allowing female guards to be present when male inmates are showering or otherwise naked); Tasby v. Lynaugh, 123 Fed.Appx. 614 (5th Cir., Feb. 18, 2005) (not selected for publication in the Federal Reporter) (available on WESTLAW at 2005 WL 388628) (holding that "strip searches carried out in non-secluded areas of the prison and in the presence of prison employees of the opposite sex are not unconstitutional).

By contrast, in Moore v. Carwell, 168 F.3d 234, 236 (5th Cir. 1999), the plaintiff complained that a female officer subjected him to strip and body cavity searches, carrying out the searches herself despite the fact that male officers were present and could have done so, and no emergency circumstances existed justifying the searches. The Fifth Circuit distinguished Letcher on the basis that the female officer herself had conducted the searches, despite the presence of male officers who could have done so, and remanded the case to the district court.

In the present case, Hughes complains merely of strip searches being conducted in non-secluded areas of the prison, open to the possible view of female officers. He makes no showing that these searches were not conducted for a legitimate, security-based reason, nor that the presence of the female officers in the vicinity was not necessary for the maintenance of security or other legitimate reasons. Hughes' claim on this point is without merit.

In a related claim, Hughes contends that the strip searches in front of the female officers violates his right to religious freedom, citing the Religious Land Use and Institutionalized Persons Act (RLUIPA). However, that Act does not create an individual-capacity cause of action for

damages against individuals. Sossamon v. Lone Star State of Texas, 560 F.3d 316, 329 (5th Cir. 2009).

Furthermore, Hughes has not shown a violation of RLUIPA. That statute provides that no government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution unless the government shows that the imposition of the burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest.

Even assuming that being strip searched in front of females amounts to a "substantial burden" on Hughes' exercise of his religious belief, the courts have held that the maintenance of security within a prison is a compelling governmental interest. Sossamon, 560 F.3d at 332. In addition, the prison has a compelling interest in offering equal employment opportunities to female officers. Sinclair v. Stalder, 78 Fed.Appx. 987 (5th Cir., October 28, 2003) (not selected for publication in the Federal Reporter) (available on WESTLAW at 2003 WL 22436063). This is in part because the practice of assigning women to such positions is governed by a class action lawsuit styled Coble v. Texas Department of Corrections, civil action no. H-77-707-CA, 1982 WL 1578 (S.D.Tex. 1982).

The case of Collins v. Scott, 961 F.Supp. 1009 (E.D.Tex. 1997), while applying a prior law, is nonetheless instructive. In that case, a Muslim inmate complained that strip searches conducted in the presence of female officers placed a substantial burden upon his religion. This Court, applying the Religious Freedom Restoration Act,[1] concluded that the strip searches of male inmates in the presence of female guards was in furtherance of the prison's compelling interest in security and was the least restrictive means of furthering that interest. Collins, 961 F.Supp. at 1014.

The Fifth Circuit has held that the standards under RLUIPA are nearly the same as those under RFRA *See* Longoria v. Dretke, 507 F.3d 898, 901 (5th Cir. 2007); Thompson v. Scott, 86

---

[1] This Act was struck down by the Supreme Court in City of Boerne v. Flores, 521 U.S. 507, 532-36 (1997). The Fifth Circuit has referred to RFRA as the "prior incarnation" of RLUIPA. Sossamon. 560 F.3d at 328 n. 34.

Fed.Appx. 17 (5th Cir. 2004). In addition, RLUIPA adopts the same heightened scrutiny standard as was used in RFRA. Cutter v. Wilkinson, 544 U.S. 709, 715 (2005). The findings of this Court in Collins, made under RFRA, are thus instructive with regard to claims made under RLUIPA. These findings compel the conclusion that Hughes' RLUIPA claim is without merit because the presence of female officers in the vicinity where strip searches are being conducted is in furtherance of compelling governmental interests.

## Exposure to the Cold

Hughes also complains that for a time, the strip searches were being conducted outside, exposing him to the cold. He acknowledged that this practice had been discontinued.

The Fifth Circuit has held that exposure to cold temperatures without adequate protection can constitute an Eighth Amendment violation, but allegations regarding cold which fail to state a claim of a sufficient serious deprivation, which denies the minimal civilized measures of life's necessities, are not sufficient. Palmer v. Johnson, 193 F.3d 346, 352 (5th Cir. 1999). In Palmer, the Fifth Circuit held that confinement of prisoners to an outdoor space, exposed to the cold with inadequate protective clothing and no means to dispose of bodily waste, for a period of 17 hours, set forth a potential constitutional violation.

In the present case, the exposure period was far shorter than 17 hours; in the one instance for which Hughes gave a time frame, he said that he was outdoors awaiting the strip search for approximately five minutes. Hughes does not state how many times the strip searches were conducted outdoors or the inmates had to wait outdoors for the searches to take place before the practice was discontinued, but he does not allege any longer exposure period than five minutes.

The Fifth Circuit has held that indicia of confinement constituting cruel and unusual punishment include wanton and unnecessary infliction of pain, conditions grossly disproportionate to the severity of the crime warranting imprisonment, and the deprivation of the minimal civilized measures of life's necessities. Wilson v. Lynaugh, 878 F.2d 846, 848 (5th Cir.), *cert. denied* 493 U.S. 969 (1989). The Supreme Court has held, however, that to the extent that prison conditions are

restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society. Rhodes v. Chapman, 452 U.S. 337, 346-7 (1981).

The Rhodes Court held that any Eighth Amendment analysis must look to the evolving standards of decency that mark the progress of a maturing society, but cautioned that the standards are derived from objective factors. Rhodes, 452 U.S. at 346.

In compliance with the Supreme Court's opinion, the Fifth Circuit has stated that the Eighth Amendment does not afford protection against mere discomfort or inconvenience. Wilson, 878 F.2d at 849.

In this case, the sending of prisoners outside to await a strip search, in November, was a practice which was highly questionable. Had Hughes been exposed to the cold for any significant length of time, this could have raised Eighth Amendment issues.

In fact, however, Hughes testified that he waited outside on one occasion for approximately five minutes, and gives no indication that other occasions involved any greater length of time. Such a brief duration of exposure falls in the realm of "discomfort or inconvenience" rather than a deprivation of the minimal civilized measures of life's necessities. The Court does not condone exposing prisoners to the elements, and notes that prison officials have now wisely discontinued this practice, but exposure to the cold for a period of five minutes, even on multiple occasions, simply does not rise to the level of a violation of the Constitution of the United States. *See, e.g.*, Morris v. Ley, civil action no. 05-C-0458 (E.D.Wisc., December 5, 2006) (unpublished) (available on WESTLAW at 2006 WL 3512955) (exposure to Wisconsin winter conditions without a coat and for approximately two to three minutes, on multiple occasions did not amount to cruel and unusual punishment); Canell v. Multnomah County, 141 F.Supp.2d 1046 (D.Or. 2001) (exposure to cold weather for less than five minutes did not state a constitutional claim; even though the prisoner caught a cold, he did not seek medical treatment or develop complications such as bronchitis or pneumonia). Hughes' claim on this point is without merit.

Retaliation

Finally, Hughes alludes in his complaint to a claim of retaliation, stating as follows:

> Plaintiff believes that the defendants are retaliating on plaintiff and the rest of the 12 Building workers because their unit wardens were all over the national TV because of a serious breach of security on the Death Row. All defendants except Hirsch were in charge of the security of the 12 Building.
>
> Also other proof which leads plaintiff to believe that the defendants are retaliating is the fact that one of my witnesses heard Captain Bryant say that if they are going to search us [i.e. the officers] coming in to work then these inmates are going to get it worse.

Hughes says that he later discovered that after the events occurred with the cell phones, all employees are required to submit to pat searches, although not as intrusive as those imposed upon the prisoners.

The Fifth Circuit has held that the elements of a claim under a theory of retaliation are the invocation of a specific constitutional right, the defendant's intent to retaliate against the plaintiff for his exercise of that right, a retaliatory adverse act, and causation, which is a showing that but for the retaliatory motive, the action complained of would not have occurred. Johnson v. Rodriguez, 110 F.3d 299, 310 (5th Cir. 1997). This requirement places a heavy burden upon inmates, because mere conclusionary allegations will not suffice; instead, the inmate must produce direct evidence of retaliation or, the more probable scenario, a chronology of events from which retaliation may plausibly be inferred. Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995). The relevant showing must be more than the prisoner's personal belief that he is the victim of retaliation. Johnson, 110 F.3d at 310, *citing* Woods v. Edwards, 51 F.3d 577, 580 (5th Cir. 1995).

In this case, Hughes has not set out a constitutional claim of retaliation because he has not shown that the actions of which he complained were taken because he invoked a specific constitutional right. Instead, he says that these policies and procedures were done because of the discovery of a cell phone in the possession of an inmate on Death Row. While he says that Captain Bryant did not like the fact that officers were being subjected to searches and said that "the inmates are going to get it worse," this is not the same as the invocation of a protected constitutional right

by an inmate and an officer retaliating against the inmate for the invocation of that right. This is the essence of a retaliation claim; because Hughes has not met the elements of such a claim, his assertion on this point is without merit. *See also* Tighe v. Wall, 100 F.3d 41, 43 (5th Cir. 1996).

## Conclusion

28 U.S.C. §1915A requires that as soon as practicable, district courts must review complaints wherein prisoners seek redress from governmental entities or their employees. Section 1915A(b) requires that upon review, the court shall identify cognizable claims or dismiss the complaint or any portion thereof if the complaint is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.

The term "frivolous" means that a complaint lacks an arguable basis in law or fact; a complaint is legally frivolous when it is based upon an indisputably meritless legal theory. Neitzke v. Williams, 490 U.S. 319, 325-7 (1989). A complaint fails to state a claim upon which relief may be granted if as a matter of law, it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. Neitzke v. Williams, 490 U.S. 319, 327, (1989), *citing* Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); *see also* Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir. 1995).

In this case, Hughes' complaint lacks any arguable basis in law and fails to state a claim upon which relief may be granted. Consequently, his lawsuit may be dismissed as frivolous and for failure to state a claim under 28 U.S.C. §1915A(b). *See generally* Thompson v. Patteson, 985 F.2d 202 (5th Cir. 1993). It is accordingly

ORDERED that the above-styled civil action be and hereby is DISMISSED with prejudice as frivolous and for failure to state a claim upon which relief may be granted. 28 U.S.C. §1915A. It is further

ORDERED that any and all motions which may be pending in this civil action are hereby DENIED.

So **ORDERED** and **SIGNED** this **11** day of **January, 2010.**

_____
JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE